I want to welcome everyone to the 4th Circuit Court of Appeals this morning. We have interesting cases and good lawyers, and we're looking forward to it. In the first case, the County Commission of Fayette County v. National Grid et al., Mr. Callaghan. Good to see you, Mr. Callaghan. Good to see you, Your Honor. Thank you so much. May it please the Court, my name is Michael Callaghan. I represent the Fayette County Commission of West Virginia in this case. Simply put, this case is about Fayette County's efforts to clean up mine waste left by coal companies over the years in West Virginia. Fayette County is in a unique place to do that. It has a national park within its borders, and Fayette County is set out to try to eliminate acid mine drainage within its borders. Now, I will tell you the court, these are called gob piles, garbage of bituminous. They emit acid mine drainage, they ruin streams, they drop pH, they kill fish. These are environmental problems left by coal companies in the 50s and 40s who left this mess for the state or the county to try and clean up. And no, unlike the appellees argue, this is not rock on top of a hill. This is exposed mining waste which includes coal, coal waste, and other things where the rain hits it, picks up all of these contaminants, iron, manganese, arsenic, low pH, high conductivity, and it flows into the creeks of West Virginia. Fayette County is a West Virginia political subdivision which has been granted the full police powers of the sovereign state of West Virginia to abate public nuisances within that county. That is a fact I submit to you, it was ignored by the district court on day one. Are you talking about the ordinance that you adopted? Yes, your honor. And what the effect of it is? Yes, your honor. Is it your position that Fayette County can declare what a public nuisance is? Yes, your honor. Does that run contrary to the Supreme Court precedent in West Virginia? I don't think so, and we'll address the details of the Parker and the other decision, Sharon Steele, in just a minute, but let me start off on a higher level if I could. The two statutes, 713KK and FF, both of those statutes grant Fayette County the authority to abate public nuisances. You call them statutes, they're Fayette County ordinances? Ordinances, no, let me back up. West Virginia statutes grant to Fayette County the ability to issue ordinances and do things. Okay. And those two statutes, West Virginia codes... The legislature at West Virginia conveyed that or delegated that or assigned that to Fayette County? That's correct. And if you read those two statutes, the legislature used words like plenary, all right? I had to really study on that word, but that's pretty much an absolute grant of public nuisance abatement authority to Fayette County. Plenary authority, you say? Pardon? Plenary? That's what the word is in the statute, your honor. The statute authorizing. Authorizing Fayette County to enact ordinances. The other statute, it uses the phrase anything, and that's the word in the statute, the West Virginia statute. Anything that Fayette County deems to be a public nuisance, they can abate. Now, I'm not here trying to tell the court that that means Fayette County can pick anything, all right, and decide it's a public nuisance. It has to be rationally related or a rational basis to do so. And where the district court got this wrong from day one, it looked at common law public nuisance as applied between parties. It failed to go back to the statutory grant of authority on KK and FF that I discussed and what that authority was to the County Commission of West Virginia. Now, I'm not going to tell anyone the court doesn't have review authority over what the County Commission does, but it certainly does not sit as a super legislature or a legislative body as the court did in this case. Let me give you an example. If the Fayette County Commission comes in and let's just say one of the commissioners, her husband ran off with another woman in a green truck. I drive a green truck. Well, if that commissioner proposes an ordinance that says all green trucks are banned in Fayette County, well, that's silly. And that violates due process, constitutional provisions, and a whole bunch of other things. So, there has to be some rational basis, and the district court did not follow that. Which case are you getting that from that says it has to be some rational basis of relation? The irrational basis standard that you… Well, I'm talking general, substantive, and procedural due process. Yes, but I'm asking where are you getting the rational… There are many Supreme Court cases that say a legislation, when it's enacted, it has to form a rational basis as to protecting the public. I can't give you a slide off the top of my head. But the concept is the Fayette County Commissioners are elected, and I'll go about 10 seconds or 20 over if I may. The Fayette County Commission, they are elected people. The citizens of Fayette County puts them in their spot to be commissioners. They decide what is an acceptable risk within Fayette County, and that acceptable risk should be constitutionally accepted so long as it passes due process provisions as enumerated by our Supreme Court. Let me ask you something. Sure. As long as you get questions, you keep answering them. Okay. Is a violation of the state criminal law, per se, a public nuisance? I would argue that it is, yes. Is a violation of the federal criminal law a public nuisance in Fayette County? In the context of the… Yes, yes. You're saying a violation of criminal law. Did I say criminal law? A violation of criminal law is automatically or per se a public nuisance. Under the ordinance, we would have to come to court to prove that, but yes, it would be a per se public nuisance. Okay. Did you have any cases directly on point that say that? I do not. Okay. Can I ask you one more question before you sit down?  On this question, is there any distinction between the ordinance and what it covers and the other claims that you brought? The district court said that these are like dominoes. And it said, well, the federal claim fails. The common law public nuisance claim fails. The West Virginia statute claim fails. And those are the same sorts of obligations that the ordinance covers. Therefore, the ordinance claim fails. And in your brief, I was looking for a distinction that you were going to draw between, no, no, the ordinance would prohibit other things, and that's what this is about. But I didn't see any distinction being drawn between the ordinance, what the ordinance covers, and what these other claims cover. But I wanted to give you a chance to address that. Well, we attempted to address that in one of the sections of the brief where we talk about the provisions of the ordinance that we were relying on in this case. But to answer your question broader, where the district court got it wrong, it is the same with the Ricker statute, the ordinance, and public nuisance. The district court, in its very first order, said the county is tasked with the burden of proven harm. And if you look in some of the orders, the district court says, well, the county was foolish or frivolous in bringing this because we didn't show a statutory or an environmental quality violation. Well, that's not the standard for public nuisance. Imagine driving down a West Virginia road and you see tires and refrigerators on the side of the road. You know that's an open dump, you know that's a public nuisance, and you know it should be fixed. The question is not, is that leachating into the environment causing harm? It's an eyesore. An eyesore is a nuisance? It is, Your Honor. An eyesore that causes potential harm to the public. So my question is, do you have, if your federal claim, if your RCRA claim fails, if your West Virginia statutory claim fails, if your common law nuisance claim fails, is there any argument that the ordinance independently can support this lawsuit? Yes. And what is that? That argument is the Fett County Commission was delegated the authority. I get that, I get that. What part of the ordinance specifically is different than all those other legal obligations? All right, so I'll cite for the court sections 5B, 5A.10, and it declares any act or commission or omission in any condition which constitutes a nuisance by statute or common law of West Virginia if one committed, omitted, or existing within Fett County is declared to constitute a public nuisance. Well, that seems to wrap in the common law, which if you don't have a common law claim, that wouldn't work. And a statutory claim, if you don't have a statutory claim, that doesn't work. So what, how is the ordinance on its own independent of these other legal obligations? Even if, say I assume the commission has the right to make the ordinance broader than federal law, state law, and common law. But what specific provision of the ordinance applies here that would continue to be valid if these other bases for your claim fail? When, I guess I come back to the core argument, when the commission was given the authority to address what is a public nuisance, an elected body decided. I'm assuming, I don't want to keep you, I know you have a co-counsel who wants to come up, but I'm assuming the commission has that authority. The commission can enact an ordinance that's broader than federal law, broader than state law, broader than what the common law would normally call a nuisance. What I'm looking for is what is the provision of the ordinance that you think is violated here that is different from the common law, federal law, and state law. That if all those claims fail, the ordinance still independently supports liability here. Well, we have pled, and there's a whole list of things that the Fett County Commission said were a public nuisance within Fett County. And my co-counsel can probably address that better than I can. I didn't know if you were like, this was like your issue and not his. I was going to move on to the corpus issue, but these are more important issues, I think, and it's the core of our case. So, I'm going to leave it to my co-counsel. Mr. Donovan? Thank you, Your Honor. May it please the Court. Michael Donovan, Assistant Fett County Prosecuting Attorney, representing the County Commission of Fett County. I'm going to address the very question that the judge was posing to Mr. Callahan. At the predicate of this case, the very beginning of this case, Your Honor, the fundamental error here was a failure to recognize the difference between the actions of the judge and the defendant. The application of the public nuisance doctrine by a court and by a legislative body. In West Virginia, the West Virginia legislature derives its authority and it is plenary as a sovereign to do anything it determines necessary to provide adequate protection to the public. That's based on the three sections of the Constitution that say the citizens of West Virginia are the sovereign of the state. They form the government for the purpose of protecting the public and protecting the common welfare. And they delegate all of their authority to achieve protection of the public to their elected representatives. Those are cited in our brief. That's where the sovereign state of West Virginia gets its authority under the public nuisance doctrine. Not from the common law. From the Constitution of the state of West Virginia. In section 713 K.K. of the West Virginia Code, the West Virginia legislature for the first time in its history, it had previously, 100 years before, delegated some limited public nuisance authority to municipalities. But for the first time in its history, it delegated in the late 1980s and 1989, 1990, authority to county commissions. And it gave plenary authority. The authority to adopt ordinances. The authority to declare anything which the county commission determines to be a public nuisance may be abated as a public nuisance. It gave the counties power that it never gave municipalities. The power to issue orders as necessary and to take any other action necessary or appropriate in the view of the county commission to abate a public nuisance. The answer to your honor's question is straightforward. In adopting its ordinance, Fayette County was posed with a question. Because there are two statutes that grant to the county abatement authority over public nuisances. One is 713 F.F., which is the earlier statute. And it addresses a very, very limited set of public nuisances on private land that affect only private land. And it's a subsection of the statute that addresses dilapidated properties. Subsection B of that statute addresses accumulations of records of debris on private property. And there's a whole procedure set up where the actual complaints are filed before the commission, decided by the commission, and then you take a record appeal if you want to the circuit court, but it's on the record. That F.F. provision is a very limited issue. That is public nuisances that affect only private land. And it says so both in the title of the ordinance and four times in the statute itself on private property. Years later, they imagine... Your position is that the Fayette County Commission can expand what a public nuisance is in West Virginia. Yes. And they may declare... For purposes of Fayette County alone. That's absolutely correct, your honor. So it can be a public nuisance in Fayette County under your ordinance, but not be a public nuisance in Knoll County down the road. Precisely. 48 of 50 states, your honor, and the survey done and it's cited in our brief and a footnote done by the National Association of Attorneys General, it is a prevalent thing in the states to prefer the exercise of public nuisance authority at the local level of government. 48 of the 50 states delegate broad public nuisance authorities to local levels of government. In West Virginia, as I said, that was done to cities in 1898 and again in 1913. And delegating it to counties is much broader and more powerful and much more recent. And it's the ability to obey anything which the county commission determines to be a public nuisance. And that statement, anything which the county commission, is a statement not only of what they're conveying to the county commission, but it also gives this court a clear statement of what the West Virginia legislature considers to be its authority. And they are correct. As the legislature has the authority. Can I ask you just to follow up on my question to your co-counsel? Where in the ordinance do they do that? Well, let's assume, let's just assume for a minute that you're right about that, that the commission can enact an ordinance that reaches broader than the common law. If, again, totally assuming, assume that the district court was right about federal law, that there was no violation of health or environmental quality in the water, there's no contribution to, you know, et cetera, et cetera. The court was right about federal law. It's right about that there's no common law public nuisance. It was right under the West Virginia statute that all those claims fail because there's been no proof of a violation. Does the ordinance have some independent obligation different from all those obligations that still has been violated, and what is it? Precisely. And the answer is yes, it does, Your Honor. They have the authority to do it, and they did do it. And section 5A, 5, 10, 17, and B. So 5A, 5A-5, 5A-17, 5A-10, and 5B of the ordinance. And in particular, I'll address now the precise answer to your question. Well, 5A-5 is imminent and substantial endangerment to public health and the environment. That seems to have been covered already by the RCRA. No, Your Honor. May I direct the court's attention to the last phrase in that section following the word or. Impairs beneficial uses. That's right. Where in your brief can I find an argument about how the court was wrong by not addressing whether this impairs beneficial uses? Consumes the last four pages of our motion for summary judgment and the last three pages of our reply in that case. But most importantly, I would direct the court. You briefed on appeal? Do you make an argument about this on appeal? Yes, we did, Your Honor. And the point is we argued it's twofold. Your question asks me to assume that there is no common law public nuisance. We do not agree with that. I know, I know. Assuming that to be true, we have proved, and I would direct the court to paragraphs 23 through, 21 through 33 of Dr. Simonton's affidavit attached to our reply brief for the trial court in the motion for summary judgment. He demonstrates clearly that there are adverse impacts to the beneficial uses of those waters because they stress fish and it stresses and deprives the water of providing beneficial uses to aquatic life, both macro and vertebrate and fish. Concentrations of arsenic and conductivity in the water are from 33 turns what it is before the mining. Is this disputing the district court's RCRA ruling about what the tests of the water show? The court said there's no danger to health or any environment. Does it dispute it? Yes, in fact, it does. But it also goes to the point, is there an impairment of the beneficial uses of the water? That's a different question. The district court was focused entirely on harm. That was its issue. Where is harm? And it determined harm entirely by numerical standards, and that is absolutely incorrect. The narrative water quality standards in West Virginia are enforceable conditions of its Water Pollution Control Act, but more importantly, as a concept, the narrative standards for water quality in West Virginia provide that you cannot impair the beneficial uses of water. It's that very concept that the Fayette County Commission adopted and then put into its own ordinance and says, if you discharge any waste in Fayette County that impairs the beneficial use of the waters within Fayette County, then that's a public instance in Fayette County. And we have clearly established in this case, we clearly established that there were violations of the narrative water quality standards of West Virginia, and there are impairments to the beneficial uses of those waters within Fayette County, which the ordinance expressly declares to be a public nuisance in Fayette County, regardless of any actual harm. You don't need dead fish or you don't need to exceed some numerical water quality standard. You just need to demonstrate that the beneficial uses of those waters, which is to support life, health, health. Do you have any authority to support your theory that aesthetic harm is substantial harm? I'm sorry? What authority do you have that supports your position that aesthetic harm is substantial harm? Do you have any cases that support your theory regarding the aesthetic harm? I don't think we argue any purely aesthetic harm. Well, you're saying the fish don't have to die. It's just that the waters are, because of the water, the argument that you would just... No, that's, I beg your pardon, that's beneficial uses. They are established scientific criteria that tell you when, for instance, let me, may I quote from the affidavit, the declaration... I guess what I'm asking is what case do you have to support that? Case. Do you have any cases that support your argument? Your Honor, there are many cases, and I can't quote them to you right now, but there are many cases that hold that narrative water quality standards under the Federal and State Water Pollution Control Acts are enforceable. Not just the numerical standards, but the narrative standard. And the narrative standard is you may not put wastes or discharges into water which impairs the beneficial uses of those waters. And one of the beneficial uses of the water is that it supports, without stressing, fish, wildlife, and macroinvertebrates to keep the ecosystem healthy. When, there are no memorable tests for deciding when you have put enough waste in the water that it impairs that use, that beneficial use. These are called... The waste you're putting in there, let's talk about these five god powers. Yes. It's basically runoff. Acid mine drainage, yes, Your Honor. Well, runoff when it rains. It's rain precipitating through coal waste. And it runs into the stream, which runs into the Connaught River. Precisely, but it also runs into the groundwater. It runs into the groundwater and surface waters, and then it eventually makes its way to the larger river, right? But can you do that passively, or do you have to show something active? No. For instance, Your Honor, let me... What can you rely on to get to where you're going? The ordinance is... Can you rely on a violation of, a misdemeanor violation of state law? You don't need a criminal violation at all. You don't rely on that? No. Can you rely on a misdemeanor violation of the federal law? Not at all. You don't? You don't need... Have you ever heard of the Refuge Act? No, that's not required either. Have you ever heard of the Refuge Act? Of course, Your Honor, yes. Both the 33 and 38 Refuge Act, yes, Your Honor. The Refuge Act of 1899. And last amended by Congress in 1934, right? And the Refuge Act preceded the adoption of the Clean Water Act in 1969 and again in 1980. But the Refuge Act is still on the books. It is, in fact, still on the books, Your Honor. And that Refuge Act prevents the placing of waste in a location where it may enter into the waters of the United States. That is a separate criminal issue. It's a civil and criminal issue under the federal code. That's what I asked Mr. Callahan. Is a violation of the federal criminal law or the state criminal law a nuisance per se in West Virginia? Certain violations of it, yes. There is one. Would a violation of the Refuge Act of 1899 constitute a public nuisance in West Virginia? Yes, Your Honor, it would. Because in West Virginia, a public nuisance is anything which operates to the substantial detriment of the public as a whole. And it need not have an environmental harm, as this report says. Instead, it must show that it presents an impairment to the adequate protection of the public, health, safety, welfare, or the environment. And certainly, placing waste in a water system that impairs some of the beneficial uses. Have you ever alleged that in this case? That a violation of the Refuge Act? Of the Refuge Act. We have never brought that up here. We did not, but we did allege. It's a misdemeanor. It is, in fact, a federal misdemeanor. And it's punishable by a fine. Yes, Your Honor. And that's at federal law. At state law, we did plead and prove that discharge of industrial waste into the waters of the state is prohibited by Section 8 of the West Virginia Water Quality Control Act. The material, the acid mine drainage leachate coming off of those god piles is an industrial waste, as defined by the State Clean Water Act in West Virginia, and it's prohibited. You may not place industrial waste in a location where it may enter into waters of the state. It is doing that. We also plead and prove the violation of the Groundwater Protection Rule in West Virginia, which says, and I give the court the exact quote, but in the Groundwater Protection Rule in West Virginia, provides that you may not place, without a permit, you may not place any waste in the location where it enters into the groundwater in such a manner as to impair the beneficial uses of that groundwater. So this concept of beneficial uses is what I'm saying permeates the whole concept of public nuisance, and it is enforceable under the Clean Water Act as well. You don't need numerical violations. There are numerical standards under the Clean Water Act, and then there are narrative standards, and they're both equally enforceable and equally prohibitive. And West Virginia prohibits, and in fact, the federal Clean Water Act requires them to prohibit, any material that impairs the beneficial uses of water. And to respond to the court's question, what impairs the beneficial uses of water is a provable scientific fact. In Dr. Simonton's declaration that I referred you to, the declaration attached to the government's reply brief in the Motion for Summary Judgment, paragraphs 21 through 33 of that, will demonstrate where we have proved that those materials being discharged from these dog piles impair the use by stressing macroinvertebrates and fish causing injury to these animals, to this ecosystem, and the uses of this water for this purpose. Let us hear from them. You're on the red light. Thank you, Your Honor. And we've given you extra time, and we'll give them some extra time.  Thank you. I thank the court for its attention. We appreciate it. Good to have you with us. Yes. Mr. Harvey? Yes, Your Honor. Good morning. May it please the court, my name is Shane Harvey. I am here today on behalf of National Grid. I am fortunate to be joined today by a very good young associate, Mr. Colton Toots, who helped with the briefs. We are splitting our time today with Mr. McMillan, who's behind me, and Mr. Harry Lee. I will be addressing the county's arguments with respect to their claims of nuisance and their claims of imminent and substantial endangerment. Mr. McMillan will be addressing the county's arguments, which we did not hear much of today, but in their briefs, about the ownership of these so-called piles of rock, these AML piles, we call them. The county calls them gobblers. So you're the nuisance expert? I am the nuisance expert, yes, Your Honor, today for the next 13 minutes. Yes, sir. All right. Yes, sir. Now, do you think that the violation of a misdemeanor criminal statute in West Virginia is a public nuisance? I think it could be, Your Honor, if the statute was designed to protect the public from the effects of nuisance-type effects like health or environmental effects. I don't think the violation of a jaywalking statute would be a nuisance per se, Your Honor. How about a federal violation? A violation of federal law, misdemeanor. I think the answer would be the same, Your Honor. If the federal law was something that protected the public from nuisance-type effects, I think that a county could perhaps point to that as evidence of a nuisance per se. Are you familiar with the Refuse Act? I have to admit, Your Honor, I've been doing this for over 30 years, and I am not familiar with the Refuse Act. I heard you and Mr. Donovan talk about it. I get the gist, but I'm not familiar with it. It's generally referred to as the Refuse Act of 1899. We've been on the books for a long time. I learned about it for the first time today, Your Honor. It says this. It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited any refuse matter of any kind or description, whatever, other than that flowing from streets and sewers and passing therefrom in a liquid state into any navigable water of the United States or into any tributary of any navigable water from which the same shall float or be washed in such navigable water. And it goes on. That's 33 U.S.C. section 407, and it's been described as a misdemeanor, and it authorizes a fine. And there's a... Let's see here. In 1973, the Fourth Circuit, at 480 Fed Second 616, affirmed the conviction of Valley Camp Coal Company for violating the Refuse Act at Shrewsbury. On the Kanawha River, in a charge that said they threw, discharged, deposited, caused, suffered, etc., refuse matter to whip black coal waste matter into an unnamed tributary of the Kanawha River, which floated and washed into the Kanawha River, a navigable water in the United States. And they were convicted by a jury in Charleston, and it was affirmed by the Fourth Circuit Court of Appeals. I've given it to you here. And it's a misdemeanor, and they... And it was called by rainfall. The Court says, we reject the contention and hold that a violation of statutory offense described in the first clause of the statute is made up by proof of depositing refuse matter on the shore of a tributary of the Kanawha River and the subsequent washing of the same by rainfall into the tributary. Affirmed. And it was a misdemeanor prosecution, and that's the Refuse Act, which is still on the books, I think. Your Honor, again, I've never encountered the Refuse Act, but as you describe and read the statute, it does not resemble in any way what we have here. If I could just briefly discuss the facts. And it had a couple lawyers in it. One represented Valley Camp Coal Company by the name of Thomas Miller, who also happened to be the author of the Sharon Steel case when he later went on the Supreme Court of West Virginia. And it happened to be prosecuted by, among others, an assistant United States attorney that was me. It sounds like you did an excellent job, Your Honor. And it's a published opinion. Yes, Your Honor. And it's hardly ever been cited anywhere. And that was in 1973. That's more than 50 years ago. Judge Craven, Judge Buchner, and Judge Russell. And we might have some, I mentioned Judge Craven right over there. Your Honor, let me suggest that you would... I'm not going to charge you for any of that time. Thank you, Your Honor. Thank you very much, Your Honor. Let me suggest that you would not have prosecuted that case at this location. Pardon? Let me suggest that you would not have prosecuted that same case at this particular location. If I may, let me tell the court just a little bit about... I don't know where the records are on this case, where they even, how long they keep them when they're more than 50 years old. But I know that I wrote the indictment, and we emphasized the word suffer. They hadn't done anything. Valley Camp said that they hadn't done anything to pollute the river. This was a gob pile. It was a gob pile sitting on the back of the little tributary up there. You know where Shrewsbury is. I do, Your Honor. You know exactly where it is. And I do, too. It's less than 20 miles from Deepwater where this stream runs into the Kanawha River. But we alleged black coal waste matter. That's what was running into the river as a result of thunderstorms. And the authorities from somebody up at the statehouse, the fellows went up there, and after they had thunderstorms, they would test the water. And we didn't know what was in there, what the water was before the storm and what it was after the storm. And we had a jury trial. It's a poor Judge K.K. Hall. He's not in this courtroom. Yes, Your Honor, I imagine in that case that you were trying to abate some sort of harm to the stream. There was black material running in the stream. I think the state authorities, somebody had brought this to us, and they were wanting to get that gob pile cleaned up. Yes, Your Honor. That's what it was. Let me tell you about it. It was a preparation plant. There was a preparation plant up there. I mean, this is different. It's distinguishable from here because it was close to the river there at the preparation plant. And this is somewhere up the creek on the side of the hill. These five have been there for years. Yes, Your Honor. Basically runoff is what this case was. Yes, Your Honor. After the thunderstorm. Yes, I imagine this situation here is much different than the one you were confronted with as a prosecutor. And I knew you were going to say that. And that's what you have to say. Is it what you have to say? Has anyone brought a claim under the Refuse Act here? No, Your Honor. So you don't have to distinguish this case. You're welcome to distinguish it, but it doesn't seem like you have to. Right. Because that's not the law we're talking about. I'm trying to be respectful to Judge King, Your Honor. Absolutely. I thought that was fascinating. I had no idea. I'm just saying what you need to do might be not related to that. There's been no claim of nuisance per se here by virtue of violation of the Refuse Act, Your Honor. That's very correct. No, but the point is, I knew you were going to say that too. And that's what I was asking Mr. Callahan about. Is a misdemeanor criminal violation of the federal law a nuisance in West Virginia or Fayette County? I mean, that's what this Valley Camp case is. Would that be a nuisance? I think you'd have to have harm, Your Honor, under our law.  It has to be harm under what authority? I think there are cases in West Virginia that suggest that a mere violation of a statute is insufficient to establish a public nuisance. The conditions on the ground have to actually result in harm. We don't have that here. These piles of rock have seeps flowing from them. The seeps were tested by Dr. Simonton, as the county points out. He did find some level of iron and manganese, beryllium, arsenic, cadmium. He did not find that these materials were present in quantities that exceeded any regulatory standard designed to protect the environment. Mr. Donovan continues to talk about harm and killing fish and impairment. I have no idea what he's talking about, to be frank about it. This water was tested extensively by National Grid during the conduct of this case. National Grid went to these streams on two occasions. In the spring and summer of 2022, it conducted sampling up and down the stream at ten locations. Upstream of these god piles, as the county refers to them, and downstream of these piles of rock. Here is what was found at these ten locations. Absolutely no presence of arsenic, beryllium, or cadmium whatsoever. Very low concentrations of iron and manganese, similar to what you might find in West Virginia's most pristine streams. No exceedance whatsoever of any state water quality standards designed to protect streams. No exceedance of any maximum contaminant level under the Resource Conservation Recovery Act set by EPA to protect the environment. And no exceedance of any health-based standard under the Safe Drinking Water Act. This evidence is uncontroverted. The water in these streams is good. There is no harm. And that is what dooms the county's claims here. There is no harm or risk of harm. The county wants to argue that the district court got it wrong by applying the wrong legal standards to the county's evidence. The county's problem is it lacks any evidence of harm whatsoever. Either actual harm or even risk of harm. I see I'm short on time. That is what dooms their claim under the Resource Conservation Recovery Act. You have some more time. Keep going. Well, let me proceed then with the Resource Conservation Recovery Act, which wasn't touched upon earlier by the county. The county suggests that the district court got the standard wrong because it demanded proof of actual harm versus risk of harm. The district court did no such thing. If you read the district court's opinion, it recognized that the RCRA standard is an expansive one. We agree with that. And it is based on risk of harm, not actual harm. The district court uses the word risk throughout its opinion. It did not misapply the endangerment standard. The county's problem, again, is that it cannot even establish risk of harm. The water quality here is good, as we just discussed. There's no violation or any evidence of any possible violation of any environmental standard. On top of that, as the district court found, no one is using the groundwater in this valley, which is an important aspect in endangerment claims, as the district court recognized. The water that went to the homes came from the New River, as I recall from the breach here. And this water was flowing to the Canola River, this stream. You have that partly right, Your Honor. Let me try to clarify. Initially, there was a well in the Johnson Fork watershed. The PSD was acquired by another company that came in, West Virginia American Water. You're familiar with them. They began to use as the source of their water, water from the New River. You are right. The water in this valley flows from Johnson Fork, which we talked about, to Loop Creek, and then eventually into the Canola River. The Loop Creek gets to the river. Yes, Your Honor. To the Canola. Yes, Your Honor. The Great Canola, but the New comes into the Great Canola. The New forms the Great Canola, helps form it. It gets very confusing down there around the gully. It all ends up the same. Right. Yes, Your Honor. It all goes to the Gulf of Mexico. Eventually, yes. Mr. Donovan is dying to call something else, I think, but it's the Gulf of Mexico. Yes, Your Honor. The lack of harm here is also a problem with the county's common law nuisance claim. As the district court found, if the county cannot establish even a risk of harm for an endangerment claim, they certainly cannot prevail on a common law nuisance claim. That requires evidence of actual harm, a higher threshold, and for that reason you see the county spend almost no time in its briefing on the common law nuisance argument. It just simply cannot prevail there. Next, the county makes an argument of nuisance per se under the Solid Waste Management Act, and I want to be clear that this is not your typical nuisance per se claim. The county does not allege, for instance, that National Grid violated some regulatory standard under the Solid Waste Management Act. In fact, the county concedes that National Grid is not subject to any regulatory standard under the Solid Waste Management Act because it applies only prospectively, and National Grid's association with the site ended in 1966, well before the Solid Waste Management Act was passed in 1983. What the county claims is something different. It looks at a finding in the statute, Section 1C, where the legislature finds that the improper placement of solid waste is a public nuisance, and the county argues that it can enforce that finding, and not only enforce it, but enforce it retroactively, even though the remainder of the statute applies only prospectively, as the county concedes. That is, the county argues that it can break the statute into two pieces and enforce the legislative findings retroactively, and the rest of the statute would apply only prospectively. There are a couple of problems with this argument, as Judge Johnson found. First, Section 1C, the legislative findings, are not an operative part of the statute. The law is very clear in West Virginia and elsewhere on this point. Courts uniformly understand that legislative findings are not an operative part of the statute. They may be used... You're referring to the preamble issue. The preamble, yes, Your Honor, is often called that. That type of prefatory language... You've got a good argument on that. Thank you, Your Honor. I will move on then to the nuisance per se argument with respect to the county's ordinance, because the court did spend a lot of time... Can I ask you to see the follow-up to Judge Rushen's question earlier? Is there any way that this ordinance argument survives if you can't show the state statutory common law harm? I don't think so, Your Honor. Our law on this is very clear, starting over a century ago in the Parker decision and then continuing on with the Sharon Steele decision. The county has to show a nuisance as recognized under established law, and they can't do that, as we've discussed. So under Parker and Sharon Steele, they cannot prevail. I would also point out that this court in Winder, in the Winder decision, looked to the Sharon Steele decision in interpreting the very statute that the county relies on here, West Virginia Code 713KK. That is the source of the county's authority that they claim, and the Winder court, this court in that case, found that Sharon Steele limited the county's authority under that statute. It was limited to abating actual nuisances as recognized under common law or statute, which the county, again, cannot do here. I've lost track of where I am with my time with our discussion. Mr. Callahan says it's their position that a violation of a federal criminal statute, a misdemeanor violation, is a nuisance. I guess a nuisance per se. I just don't know what statute that would be in the context of this case. That's what I was getting at. I'm talking about the Refuge Act. Again, Your Honor. Again, it's a misdemeanor. The first five words are it shall not be lawful. It shall not be lawful. And it's been on the books since 1899. It's there. Yes, Your Honor. And Ballycamp Coal Company was fined. And that's what the statute, that's what the opinion says. Again, Your Honor. This court imposed a fine upon a violation of Section 407 of Title 33. Yes, Your Honor. As Judge Rushing pointed out, that act was not raised by the county. It hadn't been raised by the county. But it's a legal point. It is, Your Honor. It's a legal point. Even as you read the Refuge Act, Your Honor, to me out loud today, it does not sound like it. It's on the books. I don't doubt that. It doesn't sound like it covers the same conditions. Let me ask you this just in follow-up to Judge King. So has there been any prosecution under the Refuge of anyone? Because I would assume you would have to have the violation first before you get under the criminal law. There's been no prosecution of anyone at this site under the Refuge Act. There's been no mention of it until today, Your Honor. The county is not relying on the Refuge Act in this case. If there are no further questions for me, I'll turn it over to Mr. McNamara. Thank you very much, Mr. Harvey. Good to have you with us. Thank you. Mr. McMillan, you're going to explain it all to us. Yes, sir, I am. Good morning. Good morning. I'm Stuart McMillan. I represent what we refer to as a surface defendant. And one thing I will say, that the reason that we are not liable in this matter. Who's your client, Mr. McMillan? Pardee and Quercus, Your Honor. Even if there were some sort of environmental violation, which there is not. We don't have, our property wasn't involved. There's no evidence that there's some sort of environmental issue in there. You're saying none of these gob piles were on the land? That is correct. Let me just say this about the gob piles. Because I think this image, I've walked through the woods of the gob piles. And I can guarantee you that you would never know that you were walking on a gob pile. It is forested, West Virginia, densely wooded area. With a lot of different things going on. But actually it's some sort of giant gob pile. That's not the case at all. I've heard that numerous times throughout the argument. I just want the court, you don't have the luxury of going down to Fayette County and actually walking in the woods. None of these gob piles were in West Virginia. I can remember driving the highways and stayed on fire for years. Absolutely. We'd see smoke coming out of them as we drove up the turnpike. And fire at night, you could see it glowing. You're saying none of these. We do not have any fire going on, Your Honor. And I can guarantee you he wouldn't have prosecuted us under the Refuge Act. And furthermore, I think you have some active role in the Refuge Act as well. Like you actually were depositing. Our folks are passive surface owners. You're claiming your client's got nothing to do with it. You don't own the property or the gob piles. Right. We own property down there, sure, Your Honor. But where they're saying there's something bad, we didn't own that piece of property. We're near it, but we did not. Did you get summary judgment on that basis? Yes, sir, we did. We moved for summary judgment. Obviously, you know, when you bring a case, you have the burden of showing ownership. They failed to meet that burden. The court went through it in very detailed analysis. And ultimately, the pivot that the county did in our motion for summary judgment, they said, well, the 2003 deed, the operative deed, you conveyed some property, but you didn't properly reserve the tracks that are at issue. And that was the legal issue in front of Judge Johnson. And so Judge Johnson looked at the operative deed and looked at the conveying language, and it was clear and unambiguous that, indeed, we did accept certain tracks. We refer to AML properties. That was, as a matter of law, reading the deed. And that's what the court did. The argument that somehow we didn't fully delineate and establish our property lines is not the issue. That does not unwind the conveyance by parties to which the county is not part of. They're a stranger to it. So they don't even have standing to raise this issue. They raised it nonetheless. The court went through it in detail and said, no, looking at West Virginia case law, the way in which properties conveyed in West Virginia is you clearly convey it. And the only way that you can somehow say that you didn't convey it is there's just some ambiguity. It wasn't clearly conveyed or accepted. And it was done here. And for that reason, the court said summary judgment. And we got summary judgment. And then really the issue that was set forth in the appellate brief. There was a little argument about, well, maybe some of the pile is partially on tracks that weren't part of the reserve tracks. The district court seemed persuaded by plaintiff's own expert who said absolutely no one knows where these piles begin and end. Does that resolve that part of the issue? That doesn't change anything, Your Honor. That's exactly what the court did. And, again, when you talk about the golf piles, I think we have this image, and I agree with Judge King, that was the image I first had. It was some giant tower of coal refuge that was on fire at one time and so forth. That's not what we have. We have wooded hills in West Virginia. And what the court was saying with respect to something and the reason it said that's near conjecture is, look, you've got the burden of proof. Now you're coming in with an affidavit at the last second and saying we don't know where the refuge pile is. I don't know how that helps their position. It certainly doesn't help their position. And the best evidence was an expert saying we don't know where they are.  And that, to me, is just conjecture and it reinforces the problem here. If you want to bring a case like this, the first thing you should do, the threshold thing you should do is you make sure you get the right people. And then you test it and make sure it has an actual contamination at the level that you need. That wasn't done in either case. So there are two separate reasons we should be, we were dismissed and we would ask this court to affirm that. Were you dismissed or you got a summary judgment? Well, we got a summary judgment and the judgment order dismissed us. So final judgment, you won. Yes, sir. Yes, sir. Thank you, Mr. Chairman. Thank you. Mr. Lee. Thank you, Your Honor. I'm here to talk about something no one's talked about yet and I would describe it as the hanging chad in the case. It is, that's why I've got two minutes. It deals with the insurers who have been sued in this case. And I represent Continental Casualty and speaking on behalf of the various insurer defendants. The insurers were sued by the county in a direct action. The county is suing another entity's insurers, EACC, who is a subsidiary of National Grid, and owned the land on which these piles sat for a period of time. Didn't place the piles there and doesn't own them anymore. But the insurers have been brought into this case by the county on a direct action. Let me give you several reasons why. How many insurers got it? I think it's eight, nine, ten. You know, there's a series of coverage over the years and so forth, and I represent one of the carriers. For periods of time. Yes, you're correct, Your Honor. So we have raised in our briefing several points. First, the... I believe these up piles, whatever, 1920, is that what the record is? I think it is the 20s, 30s, and 40s, but by 1950, it was over. Yeah. And so nothing happened. And so... They put mine in co-operative with Johnson Fork. Yes. Yes. So there's several problems, but I want to tell you about what those issues are because I can only list... And a lot of people in southern West Virginia say they quit mining coal and left town. That's certainly the case. I've done a lot of fishing in West Virginia, Western Maryland, and you can see it. But the fish are there because I catch one once in a while. The issues are several. First, they don't cite a single authority or a single record citation in support of their arguments, which are about three or four pages long. Secondly, the ordinance they've enacted gives themselves the power to bring a direct action against insurance companies when that's not allowed under state law. State law does not allow a direct action by a claimant against insurance companies, with several exceptions that don't apply here. Yet they enacted an ordinance that says that they can do it. That's unauthorized by law. The Fayette County enacted the ordinance that authorized it. The ordinance they relied upon gave themselves the power to do something that they're not allowed to do. And the state certainly didn't authorize them to do it. The court listened to their arguments that because of the open dumping laws that EACC owned the land during, that somehow or another that would give the county the right to sue the insurance companies of EACC, which is the subsidiary of National Grid. So the district court heard the arguments and rejected them. The county argues that the district court just forgot about them or forgot about this claim, and the district court did it. You can see it from the record. But there's a final point, Your Honor. Actually, this is not your problem, but we can't see it from the record because it was not included in the joint appendix, any of these rulings about the insurers. Correct. We can go find it, but that's against our rule. It's supposed to be in the joint appendix if it's being appealed. Right. It was not in the joint appendix. You're right. And that's why, I guess, it wasn't cited by the county. But there's a practical issue, and I think part of the reason for oral argument is to talk about practical things. Insurance companies, and they're also in the record. They're not in the joint appendix, but they're in the record because the county attached them to its complaint. The insurance policies, and this is not unusual at all. It's sort of uniform. Insurance policies provide coverage, indemnity coverage, for two things, bodily injury or property damage. There's no insurance coverage for maintaining open dumps. There's no insurance coverage, as Mr. Callahan said, for eyesores on the side of the road, tires or trash. There's insurance coverage for property damage, damage to tangible property, destruction of tangible property. Those are the words used in the insurance policy. What the county is saying is it wants to pursue EACC for maintaining an open dump. There's no insurance coverage, nothing in the policy that says we'll cover you if you get sued for maintaining an open dump. It says we'll cover you if you get sued because you caused property damage, destruction and damage to tangible property. There's no proof of that. That's the whole point of this case. Given there's no proof of that, even if you sent it back to the district court, that's going to be the outcome. Because if you send it back because the county supposedly wants to put more evidence in and it didn't get the chance to do so according to it, what evidence is that going to be? They put their evidence in about what they think happened. We've got a policy that says you have to prove property damage. They now want to argue that I can prove an open dump claim without proving harm. Maybe that's a problem for EACC, and I don't think it is because EACC didn't put anything there. But it's certainly not a problem for the insurance companies because they only, only cover property damage. It's right in the term of the contract. It's putting something in the river that's not water. It's not property damage. Absolutely not, Your Honor. Property damage. Well, in the Refuge Act it says you can't put anything in there except that flowing from streets and sewers and passing there from in a liquid state. Anything that's done, that's what the language of the U.S. Code says. Into any navigable water of the United States or a tributary. Right, and I've carefully listened to the discussion. I didn't know anything about the Refuge Act either. But that's a criminal law. It is a criminal law. For doing something. And it says it shall be unlawful. But it doesn't require damage. I'm just asking if that's not damage. No. No. It would require another step to find out whether by doing something you were allowed to. And then indictment calls it black coal waste matter. Right. Into a tributary of the Canoa River. And again, as the prosecutor, Your Honor, you didn't have to prove that they damaged anything. You just had to prove that they did that. Had to prove it was black coal waste matter. Right, right. That doesn't sound too healthy. Well, Your Honor. For the people downstream that are using it for their drinking water. Your Honor, not to be cavalier, I don't disagree with you. It doesn't sound too healthy. But the proof has to be there. And here the chance was given to the county to prove that it was a problem. And they offered no proof. Now, no other questions. How did they, what exception to the rule, you can't bring a direct action against the insurers. They can't be drawn to. There's two exceptions, generally. If you seek a declaratory judgment as to whether there's coverage or not, simply a DJ, that's not sought here. Okay. And then if you have a judgment against the tort defendant and the tort defendant doesn't pay it, then you can take that next step to seek to collect that judgment against the insurance policies at issue. That's not the case here. Those are the two exceptions. And those exceptions don't apply here. Not at all. Okay. Thank you, Your Honor. Thank you, Mr. Lee. Mr. Donovan. Thank you, Your Honor. In our rebuttal on behalf of the county commission, I'm going to emphasize two incredibly pivotal points to this court. Number one, there is no requirement in West Virginia law that a nuisance has to be a nuisance at common law. That is an obligation in a judicial imposition of liability when two private litigants sue each other and ask a court to declare something to be a public nuisance. When a legislative body with the authority to do so declares by statute or by ordinance what is a public nuisance, that is a public nuisance. No common law requirement at all, as has been the law unquestioned in this nation since its inception. You're talking about state law. State law. That's right. And the answer to your argument, boiling that down to state law, and we're not the experts in West Virginia state law. But in this case, Your Honor, a federal court trying to interpret and apply that law has stated that a ordinance declaring something to be a public nuisance is not enforceable because it's not a nuisance at common law. That is error. That is plain error. And they cite to you, and inappropriately, and that's the pivotal point here, Parker v. the city of, I mean, Parker v. the 1913 case, and then Sharon Steele, which is the later 1989 case. Or, yes, 89. Your Honor, the point here is, in Parker, the West Virginia Supreme Court said two times and very clearly, a public nuisance must be declared by statute, by ordinance, or by the common law. By statute, by ordinance, or by the common law. In Parker, they struck it down because the ordinance didn't declare anything. It was as goofy a situation as you might imagine. All the ordinance said is that the city may. Not that the city did. It didn't say anything about it. The ordinance didn't really recite the enabling authority. And the Parker court said that's inappropriate. To impose public nuisance by statute, it must be imposed by statute, by ordinance, or by the common law. They then take one sentence out of the 1980 decision in Sharon Steele, which I emphasize to this court was a question on facial validity of an ordinance. Not as applied. You all both are arguing Sharon Steele supports you. I beg your pardon? Both sides are arguing that Sharon Steele is on their side, right? That's right. They say it's on your side. Absolutely it is. And the point they use, I'm saying, is one sentence. And the pivotal sentence in that decision, remembering that it was a facial validity attack, the ordinance said the permanent disposal of hazardous waste within the city boundaries is a public nuisance. And the question before the court, as that ordinance was attacked on facial validity, not any particular site or any particular thing, but the ordinance has a facial validity attack. And the court responded and said a very extensive analysis of federal and state law and noted that federal and state law have literally hundreds of pages of statutes and regulations governing hazardous waste. And the court upheld it and said that's a valid ordinance. But, of course, because it's a facial validity attack, they said when you get down to actually applying it to some actual facility or actual site, it has to, in fact, be a nuisance. It has to be what's declared to be a nuisance, either by statute, by ordinance, or by the common law. That's all the court said, one sentence. And it emphasized in that sentence it must, in fact, be a nuisance. Not at law, but in fact. Because it was a facial validity attack. They are trying to take that one sentence and have this court authorize a proposition of law that says when a legislative body declares something to be a public nuisance, it must also be a public nuisance at common law. That's not only absurd, it's an affront to the dignity of the legislative body that is the decider of what risk is acceptable to the law. West Virginia legislature has that authority and it clearly delegated that authority to the county when it said anything that the county determines to be, the county commission determines to be a public nuisance may be abated. The point being here, your honor, that there's totally distinct concepts. What is a public nuisance at common law is an appropriate control on a judicial imposition of a public nuisance. When private parties come before a court and say, please declare that to be a public nuisance, then the court probably should be bound by the common law. Can I, I don't want to cut you off here, but before your time expires, I wanted to see if you have anything to say about the insurer defendant, since that didn't come up in your opening. In the district court, it looked like the district court stayed the matter as to the insurers, and then it gave the parties 10 days to file any objections to dismissing the insurance claims after it had disposed of all the other claims. And the county commission responded to that and told the court to dismiss the insurer claims. That's the relief you sought, was dismissal without prejudice because it was just supplemental jurisdiction. What do you want us to do? The point being, your honor, that nothing was ever done on those claims. They were stayed from the very get-go. There was never any proof under them, never any proceedings, never any introduction of any evidence or arguments before the court. Well, it looks like the court gave you an opportunity to show how those claims would be different as to EACC, how the public court's rulings had not already addressed all that. But instead of saying that, you said, please dismiss these claims. No, your honor. The county responded to that with a filing before the court that said, EACC owned, maintained these godpiles after the effective date of the Solid Waste Act. So it's different than National Grid. EACC owned and operated and controlled those godpiles from 1966 to almost 2015. The Solid Waste Act, federal and state, became effective in 1983. I read your papers, even though they were not in the Joint Appendix, and even though the court's rulings on this issue were not in the Joint Appendix. I did find them and read them, and you say the dates of ownership were different, but please dismiss this for lack of supplemental jurisdiction. There was no explanation on any count, count 1, 2, 3, 4, 5, 6, 7, 8, 9, of how EACC is different from any of these other defendants. You did mention the timing probably is different, but you didn't explain why the court's rulings would not apply equally to EACC and to the insurers because of direct implications. Your Honor, I think we did. The court's ruling was that the Solid Waste Act cannot be applied to National Grid because their ownership preceded the effective date of the Act. EACC owned after the effective date of the Act and maintained it, and we said in that very same filing, therefore EACC is totally different, but there's never been any proceeding against them. There's never been any chance to introduce proof or make any argument about the claim. The claim was stayed from the get-go. So you're saying there's no final resolution to that? We said dismiss it without prejudice because, you know, we'll bring it again, but the point is there was... Well, was it dismissed? Without prejudice, yes, Your Honor. It was dismissed with prejudice, right? No, without prejudice, Your Honor. There was no prejudice in the final dismissal order of those claims. Then why are you appealing if you've got what you asked for? I beg your pardon, Your Honor. Then why are you appealing if you asked for dismissal without prejudice and you got dismissal without prejudice? What is there to appeal? Well, the point of the order is when the court dismissed, it was totally silent on the question of prejudice. The dismissal order is totally silent. The question is can you attach prejudice, and that's why we appealed to make clear that you can attach prejudice to a claim that there was never any proceeding on. There was never any chance to even introduce evidence or argument or anything on that. Maybe if we don't have a final order, it's appealable here. Well, I believe that's probably correct, Your Honor. Then we're wasting our time. As to the insurance claim, as to everybody, you have to have a final order that disposes of the case before you can come to Richmond. Yes, Your Honor. The case against there, that has to be final. Every aspect of the case. And there is a dismissal order that applies to National Grid, and that dismissal order, on its basis— That's got to be final. It is a final dismissal order, yes, Your Honor, but it's silent as to the question of prejudice. It doesn't say dismissed with prejudice. It says they're dismissed. Obviously, we believe the claims against National Grid, prejudice attaches because there was the introduction of evidence, and there was argument, and there was proof, and the court considered it and disposed of it on summary judgment. Not so with the claims against the insurers. There was no proof, no pleading, no argument, no introduction of evidence, no anything. They were stayed from the get-go and remain stayed throughout the entire case. Do you concede right now that it's dismissed, it's over with? I beg your pardon, Your Honor. Do you concede that that part of the case is— The claims against the insurers were dismissed without prejudice, yes. And, I mean, I don't think there's any other way to interpret that order because the only other way to interpret why we appealed, Your Honor, is to make clear that prejudice can't attach to that claim because there was no proceeding on it. I mean, there was no chance to even introduce evidence or argument or do anything. It was stayed at the beginning of the case and remained stayed to the final day. There were no rulings by the court on it, no decisions about it. It was just—it was that, stayed from the get-go. Okay, so— Again, if we had the orders, we would be able to look at the joint appendix and talk about this. But the district court ordered it stayed, and then it gave you an opportunity to show why it shouldn't be dismissed with prejudice with all the other claims and found that that was not shown, and then the court dismissed all the claims and closed the file. And we have background rules about what to imply if the final order is silenced. But there's a question about whether this is even properly appealed because of the violation of the appellate rules of not including these orders. Well, Your Honor stated that the court gave us a chance to prove why it shouldn't be dismissed with prejudice. It did not ever use the word prejudice. It said why it should not be dismissed. Can you show me in the joint appendix where that is? It's in the final order. In the court's order saying it's going to lift the stay, where it uses the words with or without prejudice? It doesn't. It just— But where in the joint appendix can I find that order and whether it uses those words? It's because it's not in there. And we have a rule that if you're going to appeal an order of a court, you have to include it in the joint appendix. Yes, Your Honor. I understand what the court is saying. That, again, the court put out an order and said why these claims should not be dismissed. It didn't say dismissed with prejudice or without. It said why they should not be dismissed. We responded and said Eastern Associated, the claim against the nominal Barney Eastern Associated, has never proceeded before the court. It's been stayed from the get-go. If it's going to be dismissed, it should be dismissed with prejudice, or you can refer it under supplemental jurisdiction, send it back to the state court. But the point being that there was never any proceeding on it. I mean, that's how we responded to the order. But the court's order to us was why it should not be dismissed. And we responded by saying, well, as to National Grid, that's, of course, a lot to say about that. But as to EACC, there was never any proceeding. So, I mean, if you're going to dismiss it, it would have to be without prejudice, or you could simply, you know, decline supplemental jurisdiction over it and send it back. But the point being that the order to us wasn't why it should be dismissed with or without prejudice. It was just why it should be dismissed. And that's what we responded to by that final. So the court makes it. I'm assuming that the court is saying we didn't attach the order in the appendix. And if that's true, that certainly is an error. But that's what happened. The court did not say with or without prejudice in its order. Just why should they not be dismissed. And the point we made was, as EACC, as to the county's claims against the nominal defendant EACC, there was never any proof, never any proceeding, nothing ever happened. So dismissing it, you know, any concept of dismissing it with prejudice would be inappropriate because there's no basis for doing that, right? And to say that. Thank you. I understand. Okay. Thank you, Your Honor. Appreciate it. We very much appreciate counsel's arguments. And we'll take the matter under advisement. We'll come down and greet counsel as we do as a matter of tradition here. And then we'll take a short break. Come back and finish. Goodbye.
judges: Robert B. King, Allison J. Rushing, DeAndrea Gist Benjamin